UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jarrod Wagner,

        Plaintiff,

v.

                                                Civ. No. 03-4244 (JNE/JGL)
                                                ORDER

Hesston Corporation, AGCO Corporation,
and AGCO Corporation of Delaware,

        Defendants.

---

David K. Cody, Esq., Palmer Cody & O'Dea, and Ronald H. Schneider, Esq., Schneider Law Office, appeared for Plaintiff Jarrod Wagner.

Lindsay G. Arthur, Jr., Esq., Arthur Chapman Kettering Smetak & Pikala, appeared for Defendants Hesston Corporation, AGCO Corporation, and AGCO Corporation of Delaware.

---

Jarrod Wagner brought this action against Hesston Corporation, AGCO Corporation and AGCO Corporation of Delaware (collectively, Defendants) for strict liability, negligence, and breach of warranties, after Wagner was injured in an accident involving a hay baler manufactured by Hesston Corporation. The case is before the Court on Defendants' motions to exclude expert reports and for summary judgment. For the reasons discussed below, the Court grants Defendants' motions.

## I.      BACKGROUND

While baling hay on July 10, 2001, Wagner noticed that hay had stopped moving into the baler. With the power still on, Wagner stepped off of the tractor and approached the baler to investigate. Wagner leaned over the baler frame and placed his left hand in hay that was covering the baler's pick-up tines, which are finger-like structures that keep the hay in a certain area to be picked up. Wagner's hand was caught and pulled into the baler's compression rolls,

which are part of the feed intake area.  Wagner lost his left hand and a portion of his arm as a result of the accident.

At the time of the accident, Wagner was using a Hesston 5600 Baler that was manufactured in 1974 and that his father had purchased in October 2000.  The Hesston 5600 Baler is a large round hay baler that makes cylindrical bales.  At the time of the accident, two warning decals were mounted on either side of the front of the baler, a few feet above the compression rolls.  Each decal displayed a drawing of a person with his arm in the area of the compression rolls, a large red circle surrounding the drawing, and a red slash through it.  The decal also contained an exclamation point inside a triangle next to the word "DANGER" with a further explanation of the danger below in a smaller font.

On June 26, 2003, Wagner filed a four-count complaint against Defendants in state court, alleging claims of strict liability, negligence, and breach of express and implied warranties.  Defendants removed the case to this Court.  In support of his claims, Wagner offers John Sevart and Jonathan Chaplin as experts in the design of agricultural products, both of whom intend to testify that the Hesston 5600 Baler was defective.  Defendants now move to exclude the opinions of Sevart and Chaplin under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and for summary judgment.

## II.     DISCUSSION

### A.     Motions to Exclude Expert Reports

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

or otherwise." The trial court must act as a gatekeeper in screening such testimony for relevance and reliability. *See Daubert*, 509 U.S. at 591-93; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Wagner's proposed expert testimony must meet three prerequisites to be admissible under Rule 702. *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact." *Id.* "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (citing *Kumho Tire*, 526 U.S. at 156). Second, the proposed expert must be qualified. *Id.* Third, the proposed evidence must be reliable. *Id.* As the proponent of the expert testimony, Wagner bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

In determining the reliability of expert testimony, a court should consider, among other factors: (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error";[1] and (4) whether the theory has been generally accepted. *Id.* at 593-94; *see also Lauzon*, 270 F.3d at 687. These factors, however, are not exclusive, and a "trial court is left with great flexibility in adapting its analysis to fit the facts of each case." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1082 (8th Cir. 1999). *Daubert*'s progeny provides additional factors, including "whether the expertise was developed for litigation or naturally flowed from the

---

[1] The "rate of error" factor does not apply in this case. *See Pestel v. Vermeer Mfg. Co.*, 64 F.3d 382, 384 (8th Cir. 1995).

expert's research." *Lauzon*, 270 F.3d at 687.

1.    *The Expert Report of John Sevart*

Plaintiffs retained Sevart as an expert in the design of agricultural products.  He opines that the Hesston 5600 Baler was defective in both design and manufacture because:  (1) it was not adequately guarded; (2) it should have employed an alternate "open throat" design; and (3) it lacked an emergency stop system that would mitigate injuries caused by the compression rolls.[2] Specifically, Sevart claims that feasible design alternatives were available to Defendants and should have been used.  Wagner also argues that Defendants should have retrofitted the Hesston 5600 Baler with Sevart's proposed guard and emergency stop designs.

Sevart is a mechanical engineer who has taught and provided services as a consulting engineer in the area of agricultural product design for many years.  Sevart has testified at trial or in deposition more than 3,000 times since 1968.  Sevart's testimony has been almost exclusively on the side of plaintiffs since 1981.  Much of this testimony relates to the design of hay balers. Defendants do not contest that Sevart is qualified as an expert, but instead challenge the reliability of his testimony.

In 1982, Sevart designed a guard and an emergency stop system for the Hesston 5600 Baler.  Sevart testified in his deposition that he put an emergency stop and a custom-designed guard on a Hesston 5600 Baler owned by a farmer named Quillen (Modified Quillen Baler) and tested it by unrolling a previously rolled bale in his back yard and re-baling it approximately five times.  At the time, Quillen was involved in a lawsuit stemming from an accident with the baler.

---

[2]    In his report, Sevart also opines that Defendants failed to adequately warn of the risk associated with the use of their machine.  However, he later clarified that at the time of Wagner's injury, the Hesston 5600 Baler had two warning decals that were "close enough" to the warnings he recommended and that were located in an appropriate place.

Sevart also testified that one of his employees later used the Modified Quillen Baler to bale hay in Kansas.  That employee cannot be located and there are no records of his tests.  Sevart only witnessed part of the testing in Kansas and acknowledged that the Modified Quillen Baler was tested "not very many" times in the field, making "less than a hundred" bales.  Sevart also testified that he did not set up any formal protocols, instead following the informal protocol of allowing the farmer to prepare the hay before Sevart, or his employee, baled the hay.  Sevart claims some information was recorded at the time, but apparently those records no longer exist. Sevart also made a video recording of the Modified Quillen Baler in connection with Quillen's lawsuit.

In addition, Sevart testified that he had modified a Vermeer 605C hay baler[3] by adding an emergency stop and a guard.  He also testified that he had tested the Vermeer baler by baling 400 bales of "various grasses" in 1982.  With respect to the Vermeer tests, a one and one-half page memorandum was prepared.  This memorandum summarizes generally the results of the field tests and reveals that when used "under less ideal conditions, a problem developed with excessive shear bolt breakage (every 20 bales)."  Sevart determined that the clutch had frozen, but there is no indication that the baler was re-tested to verify that the baler's utility was not adversely affected by the modifications.  This same baler was used again to make about fifteen bales of prairie grass in good conditions, during which a shear bolt broke.  After this test, Sevart recommended using a stronger bolt, but did not perform any tests using a stronger bolt.  Sevart also testified that he had tested a second Vermeer baler, but recalled no details and retained no

---

[3]     In l973, Hesston obtained a license to sell a version of a big round baler made by Vermeer, which became the Hesston 5600 Baler.  The Court assumes, for the purpose of the pending motions, that the Vermeer 605C hay baler is similar enough in design to the Hesston 5600 Baler to render the testing relevant.

records.  Sevart also made a video recording of the Vermeer 605C baler equipped with a frontal guard and an emergency stop in 1982.

Throughout his report, Sevart bases his conclusions on the "proper engineering practice," and what Sevart refers to as the "design hierarchy," which states:

a.    Eliminate hazards if possible without unduly compromising function or utility of the machine.

b.    Provide some form of physical protection or guarding from remaining hazards.

c.    Provide warnings and instructions, which can practically be followed, for avoiding the hazards.  However, warnings are not a substitute for positive safeguards.

According to Sevart, "[t]echnically and economically feasible design alternatives were available to [Hesston] that would have significantly reduced the risk without adversely affecting the utility of the baler."  For the purpose of analyzing the present motions to exclude, the Court assumes that Sevart used the proper standard of care.

a.    *Absence of guard*

Sevart opines that the Hesston 5600 Baler is defective because it did not have a guard that limited access to the compression rolls.  This opinion depends on several propositions, namely that his proposed guard would not adversely affect or unduly compromise the function or utility of the baler, would significantly reduce the risk of serious injury or death, and would not create new hazards of equal or greater severity.  Defendants do not dispute that Sevart's testimony on this issue is relevant, but instead question whether his opinions have been reached through a reliable methodology.

Reliability is the central focus of the Court's *Daubert* analysis.  *See Kumho Tire*, 526 U.S. at 154 (opinion of expert who inspected allegedly defective tire excluded because methods

6

of inspection and of analyzing data were unreliable); *In re Paolo R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) ("[A]ny step that renders the analysis unreliable under . . . *Daubert* . . . renders the expert's testimony inadmissible."). The first relevant factor in determining the reliability of Sevart's theories is whether they can and have been tested. *See Daubert*, 509 U.S. at 593. Testing is particularly important in analyzing the reliability of alternative design proposals. *See Dancy v. Hyster Co.*, 127 F.3d 649, 651-52 (8th Cir. 1997); *Peitzmeir v. Hennessy Indus., Inc.*, 97 F.3d 293, 296-98 (8th Cir. 1996); *Cummins v. Lyle Indus.*, 93 F.3d 362, 368-69 (7th Cir. 1996). Wagner does not dispute that testing is fundamental to the admissibility of expert testimony, but argues that when an expert performs *any* testing, the expert's opinions are admissible. The Court, however, rejects the notion that any testing, regardless of its scope or quality, is enough to ensure the reliability of testimony. *See Fireman's Fund Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054, 1058 (8th Cir. 2005) (criticizing limits of experimental tests conducted by expert).

Based on the record before it, the Court finds several significant problems with Sevart's testing of the proposed guard. First, Sevart's tests, as outlined above, did not adequately address whether the proposed guard would adversely affect the operation and maintenance of the baler. At best, Sevart tested his proposed guard design by making approximately 500 bales. In contrast, a baler can be expected to be used to bale as many as 5,000 bales in a single season. While the number of bales, alone, does not render Sevart's testing inadequate, there is only minimal evidence that Sevart used the baler in sufficiently varying conditions or to bale different types of grasses or hay. In addition, there is no evidence that Sevart recorded critical data or followed formal test protocols. The limited nature of his tests, together with the lack of recorded data, hinder his ability to reliably opine that the proposed guard would not impede the baler's

utility.[4]

Second, as to Sevart's conclusion that the addition of a guard would significantly reduce the risk of serious injury or death, there is no evidence that Sevart ever tested whether the guard would actually prevent an operator from being able to reach the compression rolls. In fact, during his deposition, Sevart acknowledged that an operator could reach through the guard to get to the compressions rolls. Although Sevart qualified this statement and claimed that the guard would only allow his fingers to get "nipped" and that the operator could extricate himself, he acknowledged that nothing was done to test this conclusion. It is also evident that Sevart knew how, and was able, to conduct tests to evaluate the guard's effectiveness. For example, in a 1990 paper discussing the use of safety devices for rotary field mowers to prevent serious injuries or deaths, Sevart described his field tests of a rotary mower. Specifically, Sevart explained that a log and an anthropomorphic dummy were used to simulate the guard's effectiveness of preventing blade contact with large objects. No comparable tests to verify the effectiveness of Sevart's proposed guard for the Hesston 5600 Baler have been performed. Finally, Sevart's tests fail to explore whether an operator who did become entangled in the compression rolls (with a guard attached) would be better or worse off had the guard not been there. For all of the above reasons, the Court finds that the testing factor weighs heavily against the admissibility of Sevart's testimony.

The second factor the Court considers is whether Sevart's theory has been subjected to peer review and publication. *See Daubert*, 509 U.S. at 593. Peer review is considered because

---

[4]    The Court recognizes that, with respect to the tests of the Vermeer baler, Sevart indicated that "[a]pproximately 400 bales of various types of grasses were baled . . . under good conditions . . . and under conditions of heavy windrows with clumps of hay near the ends of the rows." There is no record, however, of how many bales were made for each type of grass or how many bales were made in less than "good conditions." Accordingly, the brief explanation of the Vermeer tests does not convince the Court that the test is reliable.

"submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Peitzmeier*, 97 F.3d at 297 (citing *Daubert*).   Wagner seems to acknowledge a lack of peer review and publication of Sevart's theories by blaming "indifference on the part of farm safety specialists to the subject of why farm accidents happen."   Nonetheless, he argues that "in a broad sense" guarding theories have been subject to peer review "due to their sheer simplicity and longevity" and points to the fact that guards have been patented.   In addition, Wagner relies on the fact that Sevart has published several articles regarding machine guarding in general in American Society of Agricultural Engineers, including *Designing Safer Grain Auger Inlet Guard*, *Personal Protective Devices on Agricultural Equipment*, and *Safety Devices for Rotary Field Mowers*.   Finally, Wagner argues that his theories obtained peer review during the Quillen litigation.

The Court finds that Wagner's evidence of peer review is slim at best.   Importantly, two of the papers relied on by Wagner, *Designing Safer Grain Auger Inlet Guard* and *Safety Devices for Rotary Field Mowers*, while both speaking generally of machine guarding, focus on different equipment, grain augers and field mowers, respectively.   The third paper, *Personal Protective Devices on Agricultural Equipment*, does generally discuss interlocking guard design principles in the field of agricultural equipment, but does not discuss a barrier guard specific to a large round hay baler.   In addition, with respect to the third paper, Sevart explained that it was a "very rough" draft of a chapter to be included in a textbook and was "not intended to be the usual technical paper which might report on research, experimentation or new machinery developments."   There has been no showing that Sevart submitted his proposed guard for the Hesston 5600 Baler to any manufacturers or engineering professors for scrutiny.   *See Peitzmeier*,

9

97 F.3d at 297 (noting lack of peer review of proposed changes to machine in design defect case). The Court also notes that cross-examination and review by an opposing party's experts in litigation does not act as a substitute for peer review. *See id*. Acknowledging that peer review is not the *sine qua non* of reliability, the Court finds that this factor weighs against the admissibility of the testimony regarding the proposed guard.

Next, the Court considers general acceptance of Sevart's theory. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (citation omitted). Wagner spends a considerable amount of time discussing the acceptance that guards have received in a very general sense. In fact, Wagner refers to the Bible, Book of Deuteronomy to demonstrate that machine-guarding is a well-established principle. Although Wagner claims that the public and the industry have accepted guard designs on farm equipment, he contradicts this assertion by acknowledging that the industry has been reluctant to embrace such designs. In addition, there is no evidence in the record that any large round baler manufacturer has adopted Sevart's guard design. In fact, it appears that only John Deere has adopted *any* guard design for a round baler, and only after the Hesston 5600 Baler was discontinued. Moreover, John Deere's guard is used on a round baler with a design that potentially offers less protection from the compression rolls than that of the Hesston 5600 Baler. The Court finds that Wagner has failed to meet his burden in demonstrating general acceptance and that this factor weighs against the admissibility of Sevart's testimony.

Finally, Sevart testified that all but one of his guard designs were built in connection with litigation and the record demonstrates that virtually all of Sevart's tests were conducted in the

10

context of litigation. This fact increases the unreliability of his opinions. *See Daubert*, 43 F.3d at 1317 (noting that legitimate, pre-existing research unrelated to litigation provides the most persuasive basis for reliability).

For the reasons discussed above, the Court holds that the relevant factors, taken together, undermine the reliability of Sevart's testimony. Therefore, his opinions regarding the Hesston 5600 Baler's lack of a guard are excluded.

b.    *"Open throat" design*

Sevart also opines that the compression roller design as used in the Hesston 5600 Baler is defective because an alternate "open throat" design was available before the Hesston 5600 Baler was manufactured in 1974. The term "open throat" refers to a baler that uses an open feed intake area without compression rolls. Specifically, Sevart points to two "open throat" balers that he contends were commercially available prior to 1974—the Australian baler and the Hawkbilt baler. Defendants, however, argue that these two balers do not represent feasible alternatives because both balers produced inferior bales and never gained market acceptance. Sevart himself acknowledges that the Australian baler made inferior bales as compared to other machines on the market and Wagner has not submitted any evidence demonstrating that the Hawkbilt baler made bales quality bales. Therefore, there is a "gaping hole" between Sevart's premise that these two "open throat" designs were available and his conclusion that they baled hay as well as the Hesston 5600 Baler. *See Masters v. Hesston Corp.*, 291 F.3d 985, 992 (7th Cir. 2002).

Sevart also contends that Hesston manufactured a Model 5400 Baler that was a reasonable alternative design to the Hesston 5600 Baler. In support, Wagner submits a copy of a brochure that he claims advertises both the Hesston 5600 Baler and the 5400 Baler, arguing that Defendants must have had the technology to manufacture the "open throat" model 5400 baler in

1974.[5]   Upon review, however, the brochure does not prove that the two models were manufactured concurrently.  Even though the model number might suggest that the Model 5400 was manufactured prior to the Hesston 5600 Baler, Defendants claim that it was not manufactured until after the Hesston 5600 Baler was discontinued.   The Court again notes that the burden of demonstrating reliability is on Wagner.   With that burden in mind, the Court finds that Wagner has failed to demonstrate that the Model 5400 was available prior to the Model 5600.   Moreover, Wagner has made no showing that the Model 5400 produced bales of comparable quality.  In fact, there is record evidence that indicates the Model 5400 produced inferior bales.  (*See Report on Hesston 5400 Rounder* (May 1978), Ex. 17 to McGhee Aff.).  Thus, the Court finds Sevart's opinion that there was a commercially viable and functional "open throat" design available before 1974 is unreliable and, therefore, inadmissible.  *See Masters*, 291 F.3d at 992.

        *c.*        *Emergency stop device*

Sevart also opines that an emergency stop system should have been provided to mitigate injuries by enabling a person caught in the compression rolls to stop the powered motion of the machine.  This opinion depends on several propositions, namely, that the emergency stop device would significantly reduce the risk of serious injury or death without adversely affecting the utility of the baler, and would not create new hazards of equal or greater severity.

First, with respect to the proposition that an operator who is caught in a baler would have reduced injuries if the compression rollers stopped rotating, Defendants argue that Sevart is not qualified to render an opinion.  Wagner, on the other hand, argues that Sevart's methodology, specifically his reliance on his investigations of numerous accidents involving round balers and

---

[5]      Defendants argue that the Hesston 5400, as well as the Australian and Hawkbilt balers, were actually "ground roll", not "open throat", balers.

extrapolation from scholarly medical works, make his opinion reliable. Part of this Court's role as a gatekeeper is to ensure that an expert's testimony does not exceed the scope of his expertise. *See Wheeling,* 254 F.3d at 715 (explaining that an expert cannot testify to opinions outside area of expertise). Sevart is a mechanical engineer who has expertise in the design of agricultural equipment. He is not medically trained or educated. In addition, the Court finds that the works on which he relies, while appearing to support the general proposition that injuries may be reduced when an operator is quickly extracted from the compression rolls, alone are not a sufficient basis for Sevart's opinions. Finally, while the Court recognizes that Sevart has investigated numerous accidents involving round balers, there is no indication that these investigations, many of which occurred in the context of litigation, qualify Sevart to offer an opinion on the extent of Wagner's injuries.

Even assuming, however, that Sevart is qualified to render an opinion on the extent of Wagner's injuries, the Court finds that his conclusions with respect to the emergency stop device have not been sufficiently tested. *See Daubert*, 509 U.S. at 593. Sevart has tested an emergency stop device on a Hesston 5600 baler, the Modified Quillen Baler. Sevart himself personally tested Modified Quillen Baler by making five bales of hay. In addition, an employee of Sevart used the Modified Quillen Baler to bale fewer than 100 bales, without recording any test results. Sevart also used a Vermeer Baler equipped with an emergency stop device to bale approximately 400 bales of hay, but Sevart's own memorandum discussing this test indicates a problem with shear bolt breakage.

Based on this record, the Court concludes that Sevart's tests of the emergency stop device are not reliable for several reasons. First, Sevart never tested the proposition that the absence of an emergency stop cable made Wagner's injuries worse or whether the proposed emergency stop

cable would have prevented or reduced those injuries. Particularly, while Sevart contends that his emergency stop cable ran to all dangerous places on the Hesston 5600 Baler, there is no indication that Sevart's tests ever evaluated whether an operator entangled in the compression rolls would be able to reach the emergency stop cable, or if he could reach the cable, whether he would be able to activate it after being injured. This lack of testing makes this conclusion particularly unreliable in light of the fact that Sevart testified that the force required to activate the emergency stop was between twenty and fifty pounds. Second, Sevart's conclusion that the proposed emergency stop device would not adversely affect the operation and maintenance of the Hesston 5600 Baler was not adequately tested. As with Sevart's testing on the guard, his tests of the emergency stop device were limited in nature and duration. In addition, Sevart failed to provide crucial details or a comprehensive record of his tests. In fact, the only record of Sevart's tests appears to be the brief memorandum prepared on a Vermeer machine. As explained above, this memorandum lacked detail and indicated that problems with excessive shear bolt breakage occurred. Accordingly, the Court concludes that Sevart's testing of the emergency stop device is not reliable.

Wagner argues that emergency stop devices in general have been peer reviewed in the agricultural machinery community. In support, Wagner points to a 1958 publication *Modern Safety Practices,* which states: "[T]he function of an emergency control is to limit the seriousness of an accident. However, where the element of time is a factor an emergency stop may actually prevent an accident." Wagner also discusses generally the fact that emergency stop devices have been patented and relies on the fact that Sevart has published several papers regarding machine safety, including *Personal Protective Devices on Agricultural Equipment* and *Emergency Stop Devices for Agricultural Machinery*. In sum, the Court finds that Wagner has

submitted minimal evidence of peer review and publication and finds that this factor weighs against the admissibility of his testimony regarding the proposed emergency stop device.

As for general acceptance, Wagner claims that "the concept of emergency stop devices is so widely appreciated that it is a cliché." Wagner also refers to several papers calling for the inclusion, or endorsing the use, of emergency stop devices on farm equipment, but submits no evidence that any other manufacturer of a compression roll hay baler has incorporated any such device to this day. In addition, in his 1981 paper *Emergency Stop Devices for Agricultural Machinery*, Sevart acknowledges that "the concept [of emergency stop devices] has not been generally applied to agricultural machinery." The lack of evidence of general acceptance weighs against the admissibility of his opinion.

Finally, Sevart's proposed emergency stop device and his opinion that such a device would prevent enhanced injuries were made in connection with litigation. This factor also weighs against admissibility.

In short, the relevant factors demonstrate the unreliability of Sevart's opinion regarding emergency stop devices. Accordingly, these opinions must be excluded.

2.   *The Expert Report of Jonathan Chaplin*

Wagner retained Chaplin as a design expert in agricultural products who opines that the Hesston 5600 Baler was defective in both design and manufacture because: (1) the warning decals affixed to the Hesston 5600 Baler were inadequate; (2) the baler's compression rolls were located within reach of the operator and lacked guards; (3) the baler lacked an emergency stop device; (4) the Hesston 5600 Baler should have employed an "open throat" design instead of a "compression roller" design; (5) the baler's compression rolls operated at different speeds; and

(6) Defendants failed to instruct operators on blockage. Defendants move to strike Chaplin's report and testimony.

Chaplin is an associate professor in the Department of Biosystems and Agricultural Engineering at the University of Minnesota and a consulting engineer in the field of safety engineering and machine design. He is a member of the Institute of Agricultural Engineers in the United Kingdom and the American Society of Agricultural Engineers. Chaplin performed work in graduate school in 1975 relevant to round balers. After Wagner's accident, Chaplin baled hay using the same machine that injured Wagner. At this time, the baler was not equipped with a barrier guard or an emergency stop device. Later, Chaplin designed a shield and attached it to the baler to prevent "operator ingress into the feed roller area." In October 2004, Chaplin tested the baler by rolling a single bale of hay. In his report, Chaplin indicates that he has relied upon Sevart's reports and evaluations of both barrier guards and emergency stop devices.

    a.    Failure to warn

Chaplin opines that the warnings on the Hesston 5600 Baler were defective. First, Chaplin claims that the decal on the Hesston 5600 Baler, which contains a red circle with a slash through it signifying danger, is confusing because in England, a sign with a circle and slash through it means "no speed limit." Second, Chaplin opines that the decal is defective because it does not feature arrows pointing to the location of the danger. Third, Chaplin opines that warning decals must be placed in a certain position to maximize the likelihood that the operator will see them and asserts that the location chosen by Defendants was inadequate.

Chaplin failed to conduct any tests to support his failure to warn opinion; instead, Chaplin purports to rely on his experience in the field of human factors and various learned treatises. Specifically, Chaplin never tested whether anyone, other than himself, thought that

Defendants' warning decal was confusing, whether his alternate design (with warning arrows) would have worked better or been more easily understood, or whether the positioning of the decal was ineffective.  This failure to test weighs heavily against the admissibility of his opinion. *See, e.g., Jaurequi*, 173 F.3d at 1084; *Dancy*, 127 F.3d at 651.  Chaplin's failure to test is particularly troubling because his opinion that the decal was confusing is based on the common understanding of a symbol in another country, when, in fact, Wagner was operating the baler in Minnesota.  In addition, Chaplin's opinion appears to contradict the common understanding in this country.

Wagner has also failed to demonstrate that Chaplin's opinions have been adequately reviewed by peers or generally accepted.   There is no evidence that Chaplin submitted his proposed warning to an outside party or expert for review.  Further, there is no evidence that Chaplin's alternative warning has obtained general acceptance.  Finally, it appears that Chaplin's proposition that the use of a circle and a slash is confusing was developed for this litigation and Wagner has not submitted any evidence to demonstrate that it was developed independently or in the course of his academic research.  For all of the above reasons, Chaplin's opinions regarding the warning decal are inadmissible.

b.    *Absence of guard*

Chaplin also opines that the Hesston 5600 Baler is defective because it was inadequately guarded.  On March 15, 2005, Chaplin placed an aluminum guard on Wagner's baler and later tested the baler by making one bale of hay.  Based on that single test, Chaplin concluded that the guard did not interfere with the function of the baler.  When questioned during his deposition, however, Chaplin acknowledged that his design could cause problems, such as clogging or increased maintenance.  He also suggested modifying his design.  The Court finds Chaplin's

testing inadequate.  In addition, there is no evidence that Chaplin's proposed guard was ever subjected to peer review or generally accepted.  *See Peitzmeier*, 97 F.3d at 297.  Finally, both his guard design and opinion appear to have been developed solely for the purpose of advancing Wagner's lawsuit.  Accordingly, the Court finds that Chaplin's opinion on how his proposed guard design would have reduced Wagner's injuries is speculative and, therefore, inadmissible.  *See id.*; *see also Jaurequi*, 173 F.3d at 1084 (excluding proposed expert testimony on alternative design because of failure to provide basis for belief that opinion was anything more than unabashed speculation).

    *c.*    *Emergency stop*

Chaplin also opines that the Hesston 5600 Baler was defective because it lacked an emergency stop device.  Chaplin relies on and adopts Sevart's position, but never designed, installed, or tested an emergency stop device himself.  Defendants argue that this opinion must be excluded because Chaplin is not qualified to opine that an emergency stop would lessen injuries and because his opinion fails under *Daubert* due to a lack of testing, peer review, and general acceptance.  Because the Court has already excluded Sevart's opinion on his proposed emergency stop device, and because Chaplin has not designed or tested his own proposed design, Chaplin's opinion on this device is excluded.  *See Peitzmeier*, 97 F.3d at 297.

    *d.*    *"Open throat" design*

Chaplin opines the Hesston 5600 Baler is defective because it used compression rollers and that an alternative "open throat" design was available at the time of manufacture.[6]  The

---

[6]     It appears that this opinion relates to Chaplin's theory that the Hesston 5600 Baler should have placed the feed intake area underneath the machine so that it is guarded by location.  To the extent that Chaplin's failure to guard by location theory is distinct, the Court notes that Chaplin performed no testing of this theory and failed to demonstrate that it has been peer reviewed or generally accepted.

Hesston 5600 was manufactured in 1974. Chaplin could not identify one "open throat" baler that was on the market before this date. Instead, he cited the Australian baler as an example of an "open throat" design, but pointed to no evidence that this baler produced quality bales. Chaplin also acknowledged that, excluding ground roll balers that did not use compression rolls from the definition of "open throat" balers, the first commercially successful "open throat" baler did not arrive on the market until 1977 or 1978. Accordingly, the Court finds that there is no evidence to support the opinion that there was a commercially viable and functional "open throat" design available prior to 1974.

> e.    *Differential speed rollers*

Chaplin also opines that the Hesston 5600 Baler is defective because the compression rolls operate at different speeds. Chaplin, however, concedes that he has not tested the effect of using different speeds and that it could be "that they've done some empirical tests that show that this [using different speeds] is a better feed mechanism." Wagner does not address Chaplin's opinion on differential speed rollers in its opposition papers. The Court finds that Wagner has failed to demonstrate the reliability of this opinion and it is, therefore, excluded.

> f.    *Failure to instruct on blockage*

Finally, Chaplin claims that Defendants failed to instruct operators of the Hesston 5600 Baler on how to remove blockages from the baler. Defendants argue that this opinion is irrelevant because Wagner has not alleged that the accident involved a blockage. Wagner fails to respond to this argument and, therefore, fails to meet its burden of demonstrating admissibility. Accordingly, Chaplin's opinion on this issue is excluded.

## B.    Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Defendants move for summary judgment on the ground that without the expert testimony of Sevart and Chaplin, Wagner cannot prevail on any of his claims. In his Complaint, Wagner alleges that Defendants are strictly liable and negligent in the design and manufacture of the Hesston 5600 Baler. In addition, Wagner claims that Hesston is liable for breach of express and implied warranties for selling a product that they knew, or should have known, was dangerously defective and unsafe. Apart from his opposition to Defendants' motions to exclude the testimony of Sevart and Chaplin, Wagner did not separately oppose Defendants' motion for summary judgment and has submitted no argument or authority demonstrating that his case can continue without expert testimony.

Each of Wagner's claims rests on his allegation that the Hesston 5600 Baler is defective in its design. Under Minnesota law, in order to prevail on his strict liability, negligence, and breach of implied warranty of merchantability claims, Wagner must establish that Defendants'

product was defective.  *See Billotta v. Kelley Co.*, 346 N.W.2d 616, 622-23 (Minn. 1984) (strict liability and negligent defective design cases analyzed using same standard; must demonstrate product was defective); *Johnson v. Zimmer, Inc.*, No. Civ. 02-1328, 2004 WL 742038, at * 11 (D. Minn. March 31, 2004) (implied warranty of merchantability is breached when product is defective to a normal buyer making ordinary use of product).  Moreover, Wagner's breach of express warranty rests on the allegation that Defendants sold a product that they knew, or should have known, was dangerously defective.  Because all of Wagner's claims require a showing that the baler was defective, expert testimony is required.   Without the testimony of Sevart and Chaplin, there are no genuine factual disputes and Wagner cannot prevail.  *See Dancy*, 127 F.3d at 654-55; *Anderson v. Raymond Corp.*, 340 F.3d 520, 524-25 (8th Cir. 2003); *see also Peitzmeier*, 97 F.3d at 298 (holding that, without expert testimony, plaintiff's strict liability, defective design, negligence and failure to warn claims fail).  Accordingly, the Court grants Defendants' motion for summary judgment.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Defendants' Motion to Exclude Plaintiff's Expert Witness Report of John Sevart [Docket No. 21] is GRANTED.

2.    Defendants' Motion to Exclude Plaintiff's Expert Witness Report of Jonathan Chaplin [Docket No. 17] is GRANTED.

3.    Defendants' Motion for Summary Judgment [Docket No. 26] is GRANTED.

4.    Wagner's Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  June 30, 2005

s/  Joan N. Ericksen_____
JOAN N. ERICKSEN
United States District Judge